UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| ENRIQUE BANUELOS, | Case No. 3:11-cv-00896-MMD-VPC |
| Petitioner, | ORDER |
| v. | |
| GREG SMITH, *et al.*, | |
| Respondents. | |

This habeas matter comes before the Court for a final decision. The issues remaining for decision include those concerning respondents' procedural default defense, which the Court deferred for consideration in the context of the presentations on the merits.

## I.    BACKGROUND

### A.    Procedural Background and Claims

Petitioner Enrique Banuelos was convicted in Nevada, pursuant to a guilty plea, of the first degree murder of Miguel Diaz Salazar. (Exh. 10.)[1] He was sentenced to life with the possibility of parole after 20 years. (Exhs. 12, 13.)

The judgment of conviction was entered on March 7, 2008. (Exh. 13.) Petitioner did not file a direct appeal, and the time for doing so expired on Monday, April 7, 2008.

Petitioner filed a state post-conviction petition on September 4, 2009. (Exh. 19.) The state district court dismissed the petition as untimely (Exh. 27), and the state supreme court affirmed on that basis (Exh. 32).

---

[1]The exhibits referenced in this Order are found in the Court's record at ECF Nos. 30, 31 and 41.

Petitioner constructively filed the federal petition on or about December 12, 2011. (ECF No. 1.) On respondents' motion to dismiss, the Court held that the petition was timely because petitioner was entitled to equitable tolling from the March 7, 2008, date of petitioner's conviction through the filing of the counseled second amended petition on October 3, 2013. (ECF No. 49 at 2-7.) As noted, the Court deferred consideration of respondents' procedural default defense for consideration in the context of the presentations on the merits. (*Id.* at 8-9.)

In Ground 1(A), petitioner alleges that he was denied effective assistance of counsel at sentencing when counsel allegedly: (i) failed to present mitigating evidence; (ii) allowed the court to operate under the view that the plea negotiations included a recommendation only of a sentence of life with parole eligibility after 20 years; and (iii) improperly advised the court that there was no difference between 50 years and life at the top end of the sentence. (ECF No. 29 at 7-8.)

In Ground 1(B), petitioner alleges that he was denied effective assistance of counsel when counsel failed to advise him of his right to appeal. (*Id.* at 8.) He maintains that if he had been so advised, he would have directed counsel to appeal the judgment and sentence. (*Id.*) He alleges in the second amended petition, to indicate what his argument on direct appeal would have been, that defense counsel failed to ensure that petitioner understood the consequences of pleading guilty to the charge. (*Id.*) He alleges without elaboration that he would not have pled guilty "[b]ut for the errors, omissions and representations of trial counsel." (*Id.*)

Consideration of whether petitioner can demonstrate the prejudice necessary to overcome the procedural default of his claims and/or the prejudice required to establish ineffective assistance of counsel on the merits requires that the Court review the facts that the State likely would have sought to establish at trial.[2]

---

[2]The Court makes no factual findings as to the veracity of any assertion of fact by any witness, party or counsel at any point in the state proceedings. The Court merely refers to evidence and possible inferences that are pertinent to addressing the prejudice issues presented. Not factual statement herein constitutes a factual finding by this Court.

### B. Factual Background

Armando Baltazar ("Armando") testified as follows at the preliminary hearing. At the relevant time, Armando had known Enrique Banuelos ("Banuelos") for several months to a year. He had worked with him in construction. Armando also bought $20.00 to $40.00 worth of methamphetamine from Banuelos every week. (ECF No. 30-4 at 22-25.) [3]

Armando also knew Miguel Diaz Salazar, who he referred to as Diaz, as an occasional acquaintance. At some point, Diaz asked Armando where he could purchase some drugs. Armando introduced Diaz to Banuelos, and they ultimately conducted the transaction at Banuelos' residence with Armando present. Banuelos agreed to sell Diaz an ounce of methamphetamine at a cost of $1000.00. Diaz left with the drugs saying that he would return shortly with the money. He never returned. (*Id.* at 20-22 & 24-27.)

Armando accepted responsibility for Banuelos' loss because he had made the introduction. Banuelos also told him that he would be responsible for the debt until Diaz came back. Armando stayed for three days at Banuelos' house and worked with Banuelos on a construction job site without personally receiving any of the pay. This was not sufficient to cancel the debt, however. (*Id.* at 27-29.)

Thereafter, Banuelos came and picked up Armando a number of times to go looking for Diaz to collect on the drug debt. Armando later told detectives that Banuelos said that if the debt was not paid he was going to kill Armando and Diaz. However, Armando denied that Banuelos made such a specific statement in his preliminary hearing testimony. (*Id.* at 29-38.)

According to the testimony of Jeffrey Baltazar ("Baltazar"), Armando's brother, he took responsibility for the debt at some point because his brother would not be able to repay it. Baltazar testified that Banuelos threatened him and that he and/or his brother would be harmed if he did not repay the debt. (ECF No. 30-3 at 78-80, 90-91 & 97-98.)

///

---

[3]All page citations are to the CM/ECF generated electronic document page number, not to any page number in the original transcript or document.

According to the testimony of Alejandra Garcia, Baltazar's then girlfriend, Banuelos appeared a number of times at her trailer attempting to collect on the drug debt owed to him now by Baltazar and Armando. Banuelos said that if Baltazar did not pay, he was going "to do something" to him. Another two times two men, at least one of whom was armed, appeared at the trailer to collect the debt owed to Banuelos. (*Id.* at 6-8, 17, 51-56 & 66-73.)

According to the testimony of Ruben Zambrano Lopez, he was holding his brother Oscar's handgun because Oscar had children at home. Oscar's handgun was a chrome .38 caliber semiautomatic pistol (rather than a revolver) with brown grips. On January 29, 2007, Banuelos called and asked to borrow the gun from Ruben. When Banuelos stopped by to pick up the gun during the early afternoon, Ruben invited him to go out for a beer. Banuelos declined, telling Ruben that he did not have the time because "he was going to go and collect some money." (ECF No. 30-4 at 86-94.)

Jeffrey Baltazar and Alejandra Garcia testified collectively that Banuelos, accompanied by an acquaintance named Chaparro, came to Garcia's trailer the afternoon of January 29, 2007, once again seeking to collect the debt owed to him. Baltazar went with Banuelos and Chapparo first to a tax preparation business to see if Baltazar's tax refund had come in yet, but it had not. They then were going to take Garcia to her bank to see if she could withdraw the money from her account. Garcia told Banuelos that the account had been blocked, but he wanted to see that for himself. (ECF No. 30-3 at 9-20, 56 & 64-65 (Garcia); *id.* at 77-80 & 92-95 (Baltazar.)[4]

At some point, they learned that Diaz was at the nearby Kmart waiting to do a drug deal with a young female who was unable to follow through on the deal. They substituted Garcia for the other female and had her call Diaz ostensibly to follow through with the

///

---

[4]There were variances between Garcia's and Baltazar's accounts as to sundry specifics, such as who contacted who when and where; but each witness' testimony supports the sequence of events that afternoon as described in the paragraphs in the text.

deal. She told him that she would be driving a black Durango so that he would be able to recognize her. (*Id.* at 20-26, 39-40 & 56 (Garcia); *id.* at 80-82, 91-92 & 95 (Baltazar).)

With Garcia driving Banuelos' black Durango SUV, and with Banuelos directing her moves, they dropped Baltazar and Chapparo off at the exterior garden center for the Kmart. Banuelos remained in the backseat or behind the backseat, substantially obscured from view from outside the vehicle. After Garcia and Banuelos saw Diaz standing near the Kmart entrance, Garcia pulled into a parking space close to the entrance. Diaz had seen her and was walking toward the SUV, and she told him to get into the vehicle. (*Id.* at 23-34 & 57-58 (Garcia); *id.* at 82-83 & 88-89 (Baltazar).)

As Diaz was getting in through the front passenger door, Banuelos was turned facing away from Diaz in the back. Seeing someone in the back but apparently not yet recognizing Banuelos, Diaz said to Garcia something along the lines of "is he your friend now?" or "who is he?" She responded that the person in the back was a friend and the owner of the truck. Diaz further said that they needed to go to a nearby Sak'N Save grocery store, apparently to meet his connection to get the drugs for the deal. (*Id.* at 34-37, 38-39, 56-60 & 65 (Garcia).)

Diaz then turned to look directly in the backseat. Banuelos pointed a handgun at Diaz and said "Do you remember me?" Diaz turned away and started to open the door to try to get out of the vehicle, but Banuelos shot him in the back of the head before he could escape. Diaz then apparently fell from the vehicle onto the parking lot pavement. (*Id.* at 37-38, 40-43 & 60.)[5]

Banuelos told Garcia to drive away, but she panicked immediately after the shooting and tried to get out of the vehicle. Banuelos tried to grab her; but she was able to break free, get out of the SUV, and run. She initially ran by where Baltazar was standing and told him that Banuelos had shot Diaz. She and Baltazar then saw Banuelos drive the

---

[5]Garcia did not see what happened to Diaz immediately after the shot, seeing only the blood on the door. Other witnesses observed Diaz' body lying in the parking space after the Durango sped away.

Durango away from the scene at high speed. (*Id.* at 37-38, 43-46 & 60-63 (Garcia); *id.* at 83-88 (Baltazar).)

Garcia, still very scared, ran on toward her trailer. While she ran, she shed a tank top that she had been wearing as an outer layer, in an effort to avoid being picked up by the police. However, she was picked up by the police before she made it home. She told the police that Banuelos had shot Diaz. (*Id.* at 46-51 & 65-67 (Garcia).)

Meanwhile, multiple witnesses had seen the black Durango leaving the scene at high speed. A young girl made a point to remember the license plate number, which apparently matched Banuelos' vehicle. (ECF No. 30-4 at 6-19 (Kevin Scott);[6] *id.* at 53-64 (Pamela Brondel);[7] *id.* at 78 (picture of the license plates taken off the Durango).)

According to the testimony of Miguel Banuelos ("Miguel"), Enrique Banuelos' brother, Banuelos arrived in his Durango late on the afternoon of January 29, 2007. Banuelos appeared to Miguel to be scared, and he told Miguel that "he had f—ked somebody up with a gun." He said that he no longer had the gun after Miguel expressed concern about having the gun in the house with his children. Banuelos asked Miguel to pull his truck out of the driveway so that Banuelos could park the Durango on the inside away from view. The brothers then removed and hid the license plates for the Durango, and they tried to clean the blood off the inside of the front passenger door. They also switched jackets with one another. (ECF No. 30-4 at 65-72 & 75-85;[8] *id.* at 97-104 (Claudia Puga).) At some point, Ruben Zambrano Lopez, who had loaned Banuelos the handgun, spoke with Banuelos by phone. Banuelos told him that he had killed someone and that he would not be returning the gun. (*Id.* at 92-94.)

Miguel Banuelos and his wife took Enrique Banuelos to a woman's house near the trailers where he usually lived. He got some beer on the way. The woman with the house,

///

---

[6]Scott also positively identified Banuelos as the driver.

[7]Brondel also observed Garcia running away.

[8]The witness only reluctantly acceded later in his testimony ultimately that his brother referred to using a gun.

Ana Salgado, testified that she initially made Banuelos leave because he had a gun. He later returned without it; and she let him sleep on the sofa, because the nearby trailers did not have water. She testified that the gun was silver in color. The police later apprehended Banuelos at that location. (ECF No. 30-4 at 70-75 (Miguel Banuelos); *id.* at 103-08 (Claudia Puga); *id.* at 38-53 (Ana Salgado).)

When the police examined the Durango, they found a .38 Super Plus P caliber spent casing on the right rear floorboard under the back seat and a deformed jacketed bullet in or on the right front floorboard. The police retrieved from the home of Oscar Lopez — who had testified that he loaned to Banuelos — an empty gun box for a Colt .38 Super handgun. The caliber listed on the box corresponded with the caliber of the spent casing recovered from the Durango. (*Id.* at 117-22 (Detective Richard Laffins).)[9]

Miguel Diaz Salazar was pronounced dead at the scene. The bullet had entered the back of the right side of his head and exited above the left eyebrow, consistent with Diaz having turned away from the shooter trying to get out of the vehicle. (*Id.* at 110-13 (Sparks Police Department Lieutenant Chad Hawkins); ECF No. 32 at 7 (description of fatal injury in presentence investigation report; filed under seal).)

The State initially charged Banuelos with murder with the use of a deadly weapon. At the time of the offense, the potential penalties on a first degree murder charge ranged from a minimum determinate 50-year sentence with eligibility for parole consideration after 20 years, to a life sentence with the eligibility for parole consideration after 20 years, to a life sentence without the possibility of parole.[10] (*See, e.g.*, ECF No. 30-9 at 4 (guilty plea agreement).) At the time of the offense, conviction also on the weapon enhancement required imposition of an equal sentence consecutive to the sentence on the murder charge. *See, e.g., State v. District Court (Pullin)*, 188 P.3d 1079 (Nev. 2008) (statutory

---

[9]As background, *see generally* https://en.wikipedia.org/wiki/Colt_Commander (description of the Colt Commander semiautomatic handgun chambered in .38 Super).

[10]A conviction for second degree murder, with lesser penalties, also was possible. However, given, *inter alia*, the apparent premeditation reflected by the facts of the charged offense, Banuelos faced a substantial probability of a conviction for first degree murder.

amendment changing sentencing on a weapon enhancement to a discretionary range did not apply retroactively to offenses occurring prior to July 1, 2007). Accordingly, if tried and convicted of both first degree murder and the weapon enhancement, petitioner faced a minimum of a determinate 100-year aggregate sentence with no possibility of parole for 40 years to a maximum of two consecutive life sentences without the possibility of parole.

Banuelos was 31 years old on the date of the offense. If he went to trial and was convicted of both first degree murder and the weapon enhancement, he thus faced at a minimum, incarceration until his early seventies before any possibility of parole.

In the plea agreement, Banuelos pled guilty to first degree murder with no weapon enhancement. The parties agreed to the following with respect to sentencing:

> . . . . The State will recommend a sentence of not more than 20 years to life. The defense is free to argue as to the appropriate sentence. The State will not file additional criminal charges resulting from the arrest in this case. The parties hereby stipulate and agree that if the Court sentences Defendant to a term greater than 20 years to life with the possibility of parole that he may withdraw his plea.

(ECF No. 30-9 at 4 (last sentence handwritten and initialed).)

Petitioner thereby avoided the possibility of life sentencing without the possibility of parole, and he would be eligible for parole consideration in his early fifties rather than his seventies on the first degree murder conviction with no weapon enhancement.

The Court will discuss the particulars of the plea and sentencing further, *infra*, in the discussion of the particular claims and issues.

## II.  PROCEDURAL DEFAULT

### A.  Governing Law

Under the procedural default doctrine, federal review of a habeas claim may be barred if the state courts rejected the claim on an independent and adequate state law procedural ground. Review of a defaulted claim will be barred even if the state court also rejected the claim on the merits in the same decision. Federal habeas review will be barred on claims rejected on an independent and adequate state law ground unless the petitioner can demonstrate either: (a) cause for the procedural default and actual

prejudice from the alleged violation of federal law; or (b) that a fundamental miscarriage of justice will result in the absence of review. *See, e.g., Bennet v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003).

To demonstrate cause, the petitioner must establish that some external and objective factor impeded his efforts to comply with the state's procedural rule. *E.g., Murray v. Carrier*, 477 U.S. 478, 488 (1986)*; Hivala v. Wood*, 195 F.3d 1098, 1105 (9th Cir. 1999). To demonstrate prejudice, he must show that the alleged error resulted in actual harm. *E.g., Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). Both cause and prejudice must be established. *Murray*, 477 U.S. at 494.

### B.    Independent State Law Ground

Petitioner contends that the state time bar rule in NRS § 34.726(1) did not constitute an independent state law procedural ground with respect to federal Ground 1(B).

A state procedural rule constitutes an "independent" bar if it is not interwoven with federal law or dependent upon a federal constitutional ruling. *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985); *La Crosse v. Kernan*, 244 F.3d 702, 704 (9th Cir.2001). "A state law ground is so interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether federal constitutional error has been committed.'" *Park v. California*, 202 F.3d 1146, 1152 (9th Cir.2000) (*quoting Ake*, 470 U.S. at 75). Under established Ninth Circuit law, a state court's application of a state procedural bar does not become interwoven with and dependent upon an antecedent federal constitutional ruling where the state court discusses the merits solely to determine whether the petitioner can establish cause and prejudice to overcome the procedural default. *Moran v. McDaniel*, 80 F.3d 1261, 1269 (9th Cir. 1996). The determination of whether the petitioner can demonstrate cause and prejudice excusing a procedural default presents a purely state law question. *See Bargas v. Burns*, 179 F.3d 1207, 1214 (9th Cir. 1999).

///

In Ground 1(B), petitioner alleges that he was denied effective assistance of counsel when counsel failed to advise him of his right to appeal. Petitioner urges that the state supreme court made an antecedent federal constitutional ruling with regard to this claim in the following passage:

> Appellant filed his petition on September 4, 2009, more than one year after entry of the judgment of conviction on March 7, 2008.[FN1] Thus, appellant's petition was untimely filed. *See* NRS 34.726(1). Appellant's petition was procedurally barred absent a demonstration of cause for the delay and undue prejudice. *See* NRS 34.726(1).

> On appeal, appellant *claims that* he has cause for the delay because counsel failed to advise him of the right to appeal, and consequently, trial counsel failed to file an appeal on his behalf. Appellant fails to demonstrate cause for the delay as he did not allege that he asked trial counsel to file an appeal and that counsel refused to do so, or that he believed that counsel had filed an appeal on his behalf. *Hathaway [v.State],* 119 Nev. [248,] . . . 254, 71 P.3d [503,] . . . 507 [(2003)]. Therefore, the district court did not err in denying *this claim*.

> Next, appellant *claims that* he has cause for the delay because his access to the law library was limited by . . . .

> [FN1] No direct appeal was taken.

ECF No. 31-14 at 2-3 (italic emphasis added).

The Court is not persuaded that the Supreme Court of Nevada made any federal constitutional ruling — antecedent or otherwise — in the foregoing passage. The state high court did not address the merits of any claim for relief therein but instead addressed petitioner's claim, *i.e.*, his contention, that defense counsel's failure to appeal established cause for his failure to timely file the state petition. The state supreme court's *Hathaway* case cited by the court established that — as a matter of state law — an attorney's failure to appeal did not provide a sufficient excuse for a failure to file a timely state petition. *Hathaway* held that the failure to appeal did not constitute cause — in truth as any type of claim in an untimely state petition, not merely a failure-to-appeal claim — for an untimely filing unless, *inter alia*, the petitioner had an objectively reasonable belief that there was an appeal pending and that his limitations period thus had not even begun to run. *See Hathaway,* 71 P.3d at 507-08. The focus of the state law rule quite obviously is on whether there is a sufficient causal nexus between counsel's failure to file an appeal

and the petitioner's *pro se* failure to file a timely state petition, not upon whether a sufficient federal constitutional claim otherwise is or is not presented.

NRS § 34.726(1) accordingly constituted an independent state law ground in the circumstances presented in this particular case.[11]

### C. Cause

To demonstrate cause, the petitioner must establish that some external and objective factor impeded his efforts to comply with the state's procedural rule. *E.g., Murray, supra.*

The Court will assume, without deciding, that the circumstances that it found established a basis for equitable tolling of the federal limitation period — including, *inter alia*, a lack of access to Spanish-language legal materials — also satisfy the standard for cause. (See ECF No. 49 at 5-7.)

### D. Prejudice

Petitioner has the burden of demonstrating both cause and prejudice when seeking to overcome a procedural default. *E.g., Murray*, 477 U.S. at 494. In order to demonstrate the requisite prejudice, the petitioner must establish "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting [the] entire [proceeding] with error of constitutional dimensions." *Id.* (emphasis in original); *Leavitt v. Arave*, 383 F.3d 809, 838 (9th Cir. 2004).

Substantially for the reasons discussed *infra* in the alternative holdings on the merits, petitioner has not carried this burden in the present case.

Petitioner's claims accordingly are procedurally defaulted.[12]

---

[11]The Ninth Circuit's decision in *Cooper v. Neven*, 641 F.3d 322 (9th Cir. 2011), is not to the contrary. In *Cooper*, the state court explicitly relied on the federal constitutional analysis for a *Brady* claim as controlling the outcome of its analysis. The state court stated that the second and third components of the *Brady* claim analysis paralleled the cause and prejudice requirements required to overcome the procedural bars. No such explicit reliance occurred here.

[12]While the Court is making alternative holdings on both procedural default and the merits, a district court has the discretion in an appropriate case to bypass the procedural default issue and decide the case on the merits in the interest of judicial economy. *E.g.,*

## III. MERITS

### A. Governing Law

If the state courts do not reach the merits of a claim because the claim is dismissed as procedurally defaulted, then any federal review of the merits thereafter is conducted *de novo* rather than under the deferential standard of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005).

On petitioner's claims of ineffective assistance of counsel, he must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984).[13] He must demonstrate that: (1) counsel's performance "fell below an objective standard of reasonableness"; and (2) the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time. *Id.* at 689. The court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. *Id.* On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

### B. Ground 1(A)

In Ground 1(A), petitioner alleges that he was denied effective assistance of counsel at sentencing when counsel allegedly: (i) failed to present mitigating evidence; (ii) allowed the sentencing court to operate under the view that the plea negotiations

---

*(fn. 12 cont.)Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997). *Accord Allen v. Benedetti*, No. 14-16671, 629 Fed.Appx. 814, 815 (9th Cir., Nov. 4, 2015) (unpublished).

[13]The *Strickland* standard applies to claims of ineffective assistance of counsel in noncapital sentencing proceedings. *Daire v. Lattimore*, 812 F.3d 766 (9th Cir. 2016) (*en banc*)(overruling prior Ninth Circuit authority holding that there was no clearly established Supreme Court precedent holding same with respect to review under the deferential AEDPA standard of review).

included a recommendation only of a sentence of life with parole eligibility after 20 years; and (iii) improperly advised the court that there was no difference between 50 years and life at the top end of the sentence. With regard to mitigating evidence, he alleges that counsel failed to present "expert testimony to demonstrate that Banuelos was not a risk for recidivism or future dangerousness" and evidence "that his actions were the result of catastrophic events in his life and his addiction to controlled substances." (ECF No. 29 at 7-8.)

The State's evidence canvassed previously (*see* text, *supra* at 2-7) tended to establish that Banuelos was selling drugs in both retail and potentially distribution (an ounce of methamphetamine) quantities, that he killed the victim over a $1000.00 drug debt that had been a matter of substantial concern to Banuelos for some time, that Banuelos had borrowed the murder weapon earlier in the day ostensibly "to collect some money," that Banuelos lured the victim into a meeting where Banuelos could surprise him, and that Banuelos intentionally shot the unarmed victim in the back of the head at close range as the victim was trying to get away.

The State's evidence further tended to establish that Banuelos thereafter took multiple steps reflecting consciousness of guilt as he attempted to conceal the evidence of his guilt and evade apprehension. The State's case was supported by, *inter alia*, direct eyewitness testimony from an individual who knew Banuelos positively identifying him as the shooter, corroborating testimony by disinterested witnesses at the scene, consistent forensic evidence, and multiple inculpatory statements by Banuelos to others after the murder.

In the guilty plea agreement, as noted previously, the State agreed to recommend a sentence of not more than 20 years to life; the defense remained free to argue as to the appropriate sentence; and the parties agreed that if the court sentenced Banuelos to a term greater than 20 years to life with the possibility of parole that he would be able to withdraw his plea. (*See* text*, supra at 8.*)

////

Although Banuelos had no prior documented violent offenses, he previously had been charged — under two different aliases — with misdemeanor driving under the influence on three occasions, resulting in at least two convictions. (ECF No. 32 at 5 (presentence investigation report; filed under seal).)

Despite having pled guilty to the first degree murder of Diaz, Banuelos exhibited no remorse or acceptance of responsibility when interviewed by the state division of parole and probation. He instead made multiple not necessarily consistent statements as to what happened when Diaz was killed in an effort to deny responsibility. The division, notwithstanding the negotiations regarding sentencing, recommended a sentence of life without the possibility of parole. (*Id.* at 8-10 (presentence investigation report; filed under seal).)

In connection with the sentencing hearing, defense counsel filed a statement of mitigation accompanied by 34 letters from family, friends, and an employer seeking leniency for Banuelos and attesting to his character. At the hearing, defense counsel also noted the presence at the hearing of his wife, multiple other family members, and a friend who had attended the hearing for Banuelos. (ECF No. 11; ECF No. 12 at 4-7.)

Near the beginning of the sentencing hearing, defense counsel noted a number of corrections to the presentence investigation report, leading to the following exchange:

> MR. QUADE:. . . . .
>
>> On page 2 of the report, under plea negotiations, Your Honor, it should indicate that at the tail end of the plea negotiations [section of the report], if the Court sentences the defendant to greater than 20 years to life with the possibility of parole, then he may withdraw his plea.
>
> THE COURT:    I'm sorry. I thought that was your negotiation.
>
> MR. QUADE:    That is the negotiation.
>
> THE COURT:    Twenty years to life with the possibility, but you just said that if that is what I sentence him to, then he can withdraw his plea.
>
> MR. QUADE:    No. More than, greater than, however you want to phrase it.

* * *

(ECF No. 30-12 at 5-6.)

Thereafter, defense counsel suggested in his presentation, *inter alia*, that "the methamphetamine abuse that has been occurring . . . for at least a couple of years" explained the divergence between the strong family man and hardworking employee presented by the defense and the isolated violent crime. (ECF No. 30-12 at 7-8.)

Defense counsel closed his presentation with the following:

MR. QUADE:. . . . .

> With that said, Your Honor, we're in agreement, the prosecution and myself, as to the sentencing in this matter at least within certain parameters, and have agreed based upon Mr. Banuelos's limited criminal history, a couple of DUIs in his past, no violent-related offenses, the facts of this case and the surrounding circumstances that this case does merit no more than the 20 years to life with the possibility of parole after that mandatory minimum has been served.

> Of course, in this case, I will be asking for the 20- to 50-year sentence, and as a practical matter, it probably makes not much difference but it may make a difference as far as his classification within the Department of Prisons.

> Your Honor, being left here with very little to say regarding the situation other than to point to a man who has been generally law abiding for his life, has obviously been supportive of his family, has been a good worker as a letter from his employer attests to, and just a person that there is no real explanation of why this act occurred, I would ask that you show him some leniency in this matter and sentence him to 20 to 50 years as requested by the defense.

(ECF No. 30-12 at 8-9.)

The State argued as follows:

MR. PRENGMAN: Your Honor, we ask that the Court follow the negotiations in this case. We ask the Court – I believe, the State believes the appropriate sentence in this case is a sentence of life in prison with possibility of parole beginning after 20 years has been served.

> We believe that is, again, the appropriate sentence. We ask that you follow the negotiations and impose that sentence upon the defendant.

ECF No. 30-12 at 9.

The representative from the division of parole and probation stated:

> MR. GARRISON: Your Honor, the Division's recommendation, although it is different than what the plea negotiations were, Your Honor, we believe that the recommendation is appropriate considering the circumstances of this offense.

* * *

(ECF No. 30-12 at 10.)

Finally, the Court sentenced petitioner as follows:

> THE COURT: The Court has had numerous hearings in this case and is familiar with the parties' respective positions and many of the issues in this case.
>
> The Court will follow the negotiations of the parties. The Court will not impose the 20 to 50 years requested by the defense, but will follow the parties' negotiations.
>
> Sir, . . . . You're sentenced to life in the Nevada State Prison with the possibility of parole beginning after 20 years has been served.

* * *

(ECF No. 30-12 at 10-11.)

Against the foregoing backdrop, the Court is not persuaded on a *de novo* review that petitioner can demonstrate both deficient performance and the required prejudice under *Strickland* on Ground 1(A).

With regard to mitigating evidence, petitioner alleges only conclusory that counsel failed to present "expert testimony to demonstrate that Banuelos was not a risk for recidivism or future dangerousness" and evidence "that his actions were the result of catastrophic events in his life and his addiction to controlled substances." (ECF No. 29 at 7-8.) Petitioner provides no further specific allegations as to the substance of any such expert testimony as applied specifically to Banuelos' case at the time or as to the alleged circumstances and effects of the alleged catastrophic events and addiction history.

///

///

16

Such conclusory allegations do not establish a basis either for habeas relief[14] or for an evidentiary hearing.[15] Defense counsel did rely upon petitioner's alleged methamphetamine addiction, lack of prior documented history of violent crime, and the supposedly anomalous nature of the offense as compared to his work and family life as a basis for mitigation. The crime, however, was not a petty theft committed by a drug addict seeking money to feed his daily addiction. Rather, Banuelos was a drug dealer (any other employment notwithstanding) who hunted his victim, lured him into an ambush, and then killed him to settle a longstanding score over a potentially distribution quantity drug deal gone bad. There was not a reasonable probability that presenting the generically alleged expert testimony and/or evidence of unspecified "catastrophic events and addiction history" would have resulted in a different outcome at sentencing. The conclusory allegations do not tend to establish either deficient performance or resulting prejudice vis-à-vis counsel's presentation as to mitigation.

Petitioner further alleges that defense counsel "allowed the district court to operate under the view that the plea negotiations included only a recommendation of a sentence of life with parole eligibility." (ECF No. 29 at 8.)

The state court record, however, does not necessarily conclusively establish that the sentencing court assumed — or was allowed to assume — that the plea agreement did not contemplate the possibility also of a sentence of 50 years with the possibility of parole after 20 years. Defense counsel quite clearly stated to the Court that the prosecution and defense had agreed to a sentence of "no more than" (ECF No. 30-12 at 8:14) a 20-year to life sentence with the possibility of parole, and he argued for a 20- to 50-year sentence rather than 20 years to life. He made that argument without any

---

[14]E.*g., Greenway v. Schriro*, 653 F.3d 790, 804 (9th Cir. 2011); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (pre-AEDPA case decided on *de novo* review). Federal habeas pleading is not notice pleading, and a petitioner therefore must state the specific facts that point to a real possibility of constitutional error and allegedly entitle him to habeas relief. *Mayle v. Felix*, 545 U.S. 644, 655-56 (2005).

[15]*E.g., Coleman v. McCormick*, 874 F.2d 1280, 1284-85 (9th Cir. 1989) (*en banc*) (pre-AEDPA case decided on *de novo* review.

admonishment from the bench or objection from the State that he was arguing contrary to the plea negotiations. And the sentencing court expressly declined to "impose the 20 to 50 years requested by the defense." (*Id.* at 10.) In this context, the multiple references not only by the sentencing court but also by the State and the parole division representative to "the negotiations" thus would appear to constitute a shorthand reference to the fact that the parties had agreed that "no more" than a sentence of 20 years to life with the possibility of parole should be imposed. That was the sentence, under the negotiations, that the State agreed to recommend and that the defense agreed would not provide a basis for withdrawal of the plea. That agreement, and the defense's reservation of the right to argue for a lesser sentence, was reflected in detail at the time of sentencing, both in the plea agreement and in the presentence investigation report.

The Court accordingly is not persuaded that, on balance, petitioner has carried his burden of establishing deficient performance in this regard.

The Court further is not persuaded that petitioner can establish resulting prejudice. There was not a reasonable probability that a more explicit recital of the plea agreement by defense counsel would have led to a different outcome at sentencing, given petitioner's pre-plea maximum exposure to two consecutive life sentences without the possibility of parole, the facts of the offense outlined previously herein, the parole division's recommendation notwithstanding the plea negotiations instead of the maximum sentence of life without, and the absence of any showing of either remorse or acceptance of responsibility by Banuelos after the plea and prior to sentencing. While defense counsel had preserved the ability to argue for the lesser sentence at the time of the plea, Banuelos clearly did not help his prospects for a lesser sentence thereafter in his interview with the parole division.

Petitioner further alleges that defense counsel improperly advised the court that there was "no difference between a term of 50 years on the top end of sentence and a term of life in prison." (ECF No. 29 at 8.)

///

Defense counsel did not in fact say that there was "no difference" between the two sentences. He stated instead — with regard to the then 32-year*old defendant — that "as a practical matter, it probably makes not much difference but it may make a difference as far as his classification within the Department of Corrections." (ECF No. 30-12 at 8.)

In the federal reply, petitioner urges that defense counsel instead should have explicitly explained to the sentencing court that: (a) Banuelos eventually would expire and flatten a 50-year determinate sentence but potentially never would be released from prison on a life sentence; and (b) if eventually paroled, such parole would extend only for 50 years less good time under the determinate sentence but would extend for his entire life under a life sentence. (ECF No. 55 at 9.)

The Court is hard pressed to believe that: (a) the state district judge would not be aware of these most basic and obvious of differences between a 20- to 50-year and a 20 to life sentence; and (b) these most basic and obvious items of knowledge about the differences between a 50-year sentence and a life sentence then would be removed from the judge's consciousness by what defense counsel said, whether artful or not. In this respect, petitioner's claim runs counter to common sense.

The Court accordingly is not persuaded that: (a) defense counsel rendered deficient performance in this regard; or (b) there is a reasonable probability that an instead explicit explanation along the lines outlined by petitioner would have resulted in a different sentencing outcome, particularly given the circumstances canvassed previously herein pertaining to the sentencing.

Ground 1(A) therefore does not provide a basis for federal habeas relief.

**C.      Ground 1(B)**

In Ground 1(B), petitioner alleges that he was denied effective assistance of counsel when counsel failed to advise him of his right to appeal. He maintains that if he had been so advised, he would have appealed the conviction and sentence. He alleges in the second amended petition, to indicate what his argument on direct appeal would have been, that defense counsel failed to ensure that petitioner understood the

consequences of pleading guilty to the charge. He alleges without elaboration that he would not have pled guilty "[b]ut for the errors, omissions and representations of trial counsel." (ECF No. 29 at 8.)

In *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), the Supreme Court outlined the following standards with regard to defense counsel's duty to consult with the defendant regarding a possible appeal:

> We . . . reject a bright-line rule that counsel must always consult with the defendant regarding an appeal.
>
> We instead hold that counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. In making this determination, courts must take into account all the information counsel knew or should have known. See [citation to earlier Supreme Court authority focusing on the totality of the circumstances]. Although not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights. Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal.
>
> . . . We expect that courts evaluating the reasonableness of counsel's performance using the inquiry we have described will find, in the vast majority of cases, that counsel had a duty to consult with the defendant about an appeal. We differ from Justice Souter only in that we refuse to make this determination as a *per se* (or "almost" *per se*) matter.

528 U.S. at 480-81.

As noted by the Supreme Court, entry of a guilty plea constitutes "a highly relevant" but yet "not determinative" factor under the analysis in *Flores-Ortega*. 528 U.S. at 480. Other passages in the opinion confirm that, even in cases where the defendant enters a guilty plea, the question of whether the defendant had nonfrivolous grounds for appeal remains at the very least, if not more, an also "highly relevant" factor in determining whether counsel had a duty to consult. (*See, e.g.,* 528 U.S. at 485-86 ("evidence that

there were nonfrivolous grounds for appeal . . . will often be highly relevant in making this determination [as to prejudice] . . . [and] both [deficient performance and prejudice] may be satisfied if the defendant shows nonfrivolous grounds for appeal").).

The Supreme Court further held with regard to the prejudice inquiry that — because the deficient performance goes to the forfeiture of the appellate proceeding itself — the petitioner is not required to establish a reasonable probability that he had claims that would have prevailed on direct appeal. Rather, a petitioner only "must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." 528 U.S. at 484. The Court accordingly, consistent with prior precedent, was "presuming prejudice with no further showing from the defendant of the merits of his underlying claims when the violation of the right to counsel rendered the proceeding presumptively unreliable or entirely nonexistent." 528 U.S. at 484. In this regard, "evidence that there were nonfrivolous grounds for appeal . . . will often be highly relevant in making this determination" of whether a rational defendant would have wanted to appeal. 528 U.S. at 485.

The second amended petition contains no specific factual allegations that would tend to establish that Banuelos asked defense counsel to file a direct appeal or otherwise "reasonably demonstrated to counsel that he was interested in appealing." The second disjunctive in *Flores-Ortega* thus has no application to this case.

The second amended petition further contains no specific factual allegations, on the first disjunctive in *Flores-Ortega*, that would tend to establish that a rational defendant in Banuelos' situation would have wanted to appeal, based upon the presence of at least one nonfrivolous grounds for appeal. The pleading alleges in pertinent part only as follows:

> Banuelos maintains that his guilty plea to one count of first degree murder was predicated upon the ineffective assistance of his trial counsel. Defense counsel failed to ensure that Banuelos understood the consequences of pleading to these serious charges. But for the errors, omissions and representations of trial counsel, Banuelos would not have agreed to plead guilty. Banuelos was wholly reliant on counsel's advice and assistance.

(ECF No. 29 at 8.)

At the outset, these allegations assert a claim of ineffective assistance of counsel rather than a direct appeal claim.

However, even if the claim conceivably could have been postured procedurally as a direct appeal claim under Nevada practice in 2008, the conclusory allegations do not tend to establish that petitioner had a nonfrivolous direct appeal claim in this regard. The plea colloquy in this case — during which Banuelos stated that he was satisfied with the representation of his counsel — was extensive, thorough, and solid. (ECF No. 30-10.) Banuelos faced overwhelming evidence of guilt on a charge and weapon enhancement (*see* text, *supra*, at 2-71 & 13.) that exposed him potentially to, *inter alia*, up to two consecutive life sentences without the possibility of parole. (*See* text*, supra* at 2-8.) He was able to cap his exposure via the plea agreement to no more than a life sentence with the possibility of parole after 20 years, eliminating the very real potential of receiving a sentence that instead would guarantee that he never would be released from prison, or at best, potentially only in his seventies. (*See* text*, supra* at 8.) Particularly against that backdrop, conclusory allegations only that counsel "failed to ensure that Banuelos understood the consequences of pleading" and that petitioner would not have pled guilty but for counsel's unspecified "errors, omissions and representations" fail to state a viable ineffective-assistance claim, much less a nonfrivolous direct appeal claim. *Accord Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977)("Solemn declarations in open court [during a guilty plea] carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal . . . .").[16]

Petitioner accordingly has failed to establish that defense counsel had a duty to consult with him about a direct appeal under the standards in *Flores-Ortega.* There clearly ///

_____

[16]*See also* text, *supra* at 17 and notes 14 & 15 (conclusory allegations do not provide a basis for either relief or for an evidentiary hearing given federal habeas pleading rules).

is no blanket requirement under *Flores-Ortega* to conduct such a consultation in every case.

Ground 1(B) therefore does not provide a basis either for federal habeas relief or for an evidentiary hearing.[17]

## IV. CONCLUSION

It therefore is ordered that the petition is denied on the basis of procedural default and, in the alternative, on the merits, and that this action will be dismissed with prejudice.

It further is ordered that a certificate of appealability is granted in part and denied in part. A certificate of appealability is granted as to the portion of Ground 1(A) alleging that petitioner was denied effective assistance of counsel because counsel allowed the sentencing court to operate under the view that the plea negotiations included a recommendation only of a sentence of life with parole eligibility. A certificate of appealability is denied as to all remaining claims as reasonable jurists would not find the district court's decision as to those claims to be debatable or incorrect.

///

///

///

///

---

[17]The represented petitioner seeks to raise allegations in the federal reply that were not presented in Ground 1(B) of the counseled second amended petition as grounds for relief under *Flores-Ortega*. Petitioner seeks to present allegations that he desired and expected a lower sentence, that counsel knew this, that he would have had grounds to challenge the sentence including as a result of the sentencing court's alleged erroneous understanding of the plea agreement, and that a direct appeal therefore "could have easily resulted in a new sentencing proceeding." (See ECF No. 55 at 11.)

Federal habeas pleading, again, is not notice pleading. A petitioner therefore must state the specific facts that point to a real possibility of constitutional error and allegedly entitle him to habeas relief on a claim. *Mayle*, 545 U.S. at 655-56. No such factual allegations were presented in the second amended petition in support of the claim for relief under Ground 1(B) based upon defense counsel's failure to consult regarding a direct appeal.

A petitioner may not use a reply to an answer to raise additional allegations that are not included in the federal petition in support of a claim. *E.g., Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). The allegations accordingly are not properly before the Court on Ground 1(B); and the Court, in the exercise of its discretion, does not consider them.

The Clerk of Court will enter final judgment accordingly, in favor of respondents and against petitioner, dismissing this action with prejudice.

DATED THIS 13th day of July 2017.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE